******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DEUTSCHE BANK AG *v.* CAROLINE VIK ET AL.
## (AC 48622)

Elgo, Clark and Wilson, Js.

*Syllabus*

The plaintiff bank appealed from the trial court's judgment granting the motion for summary judgment filed by the defendants, A and C, on the plaintiff's complaint alleging, inter alia, tortious interference with business expectancy. The plaintiff claimed, inter alia, that the court improperly determined that the doctrine of res judicata barred the plaintiff's claims. *Held*:

The trial court erred in granting the defendants' motion for summary judgment as to C on the ground that that the plaintiff's complaint was barred by the doctrine of res judicata, as the defendants waived that defense because they did not plead the special defense with respect to C before the court and expressly indicated that they were not asserting such a defense on her behalf, and the court erred in its conclusion that C was in privity with A for res judicata purposes.

The trial court improperly concluded that no genuine issue of material fact existed as to whether res judicata barred the plaintiff's claims with respect to A, as the court improperly concluded that the present case involved the same underlying claims as a previous action for res judicata purposes and that the plaintiff had a full and fair opportunity to fully litigate the claims advanced in the present action in the previous action.

This court concluded that the trial court improperly determined that the doctrine of res judicata barred the plaintiff's claims of tortious interference with business expectancy and violations of the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.), as the public policy goals of the doctrine were outweighed by the plaintiff's interest in the vindication of a just claim.

The trial court improperly concluded that the doctrine of collateral estoppel applied to the issues in present action, as the present action was predicated on different conduct regarding a different transaction than the transactions at issue in the previous action, the court's adjudication of the issue in the previous action was not necessary to the judgment in that action, and the requisite identity of issues between the previous action and the present action necessary to advance a collateral estoppel defense was lacking.

Argued March 16—officially released July 21, 2026

*Procedural History*

Action to recover damages for, inter alia, tortious interference with business expectancy, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Ozalis, J.*,

granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Reversed*; *further proceedings*.

*David G. Januszewski*, with whom were *Thomas Goldberg*, and, on the brief, *Sheila C. Ramesh*, pro hac vice, *Sesi V. Garimella*, pro hac vice, *John W. Cerreta*, and *Kayla M. Sinko*, for the appellant (plaintiff).

*Monte E. Frank*, with whom were *Dana M. Hrelic* and *Meagan A. Cauda*, for the appellees (defendants).

*Opinion*

ELGO, J.  This is the latest chapter in a long running saga regarding the collection of a foreign judgment. The plaintiff, Deutsche Bank AG, appeals from the summary judgment rendered by the trial court in favor of the defendants, Caroline Vik and Alexander Vik.[1]  On appeal, the plaintiff contends that the court improperly determined that (1) the doctrine of res judicata barred its tortious interference with business expectancy and Connecticut Unfair Trade Practices Act (CUTPA) claims; see General Statutes § 42-110a et seq.;[2] and (2) the doctrine of collateral estoppel barred it from relitigating certain issues.  We reverse the judgment of the trial court.

Mindful of the procedural posture of this case, we set forth the following facts as gleaned from the pleadings, affidavits, and other proof submitted, viewed in the light most favorable to the plaintiff.  See, e.g., *Martinelli* v.

---

[1]For clarity, we refer to Caroline Vik and Alexander Vik individually by first name and collectively as the defendants in this opinion.

[2]CUTPA is "a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . .  The act provides for more robust remedies than those available under analogous common-law causes of action, including punitive damages . . . and attorney's fees and costs, and, in addition to damages or in lieu of damages, injunctive or other equitable relief. . . .  [It] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b."  (Citations omitted; footnote omitted; internal quotation marks omitted.)  *Marinos* v. *Poirot*, 308 Conn. 706, 712–13, 66 A.3d 860 (2013).

*Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009). The plaintiff is a corporation organized under the laws of Germany, with an office in New York City. Alexander is a Norwegian national whose primary residence and domicile has been in Greenwich since 1988. Caroline is Alexander's adult daughter and also resides in Greenwich.

Alexander is a billionaire and sophisticated investor who uses various companies to hold his assets and make investments on his behalf. Sebastian Holdings, Inc. (SHI), a corporation formed under the laws of the Turks and Caicos Islands, is one such company. From 1988 to 2015, Alexander owned 100 percent of the shares of SHI, was its sole director, and controlled all aspects of its operations and financial transactions.[3]

SHI became a client of Deutsche Bank (Suisse) SA, a wholly owned subsidiary of the plaintiff, in 2004. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 346 Conn. 564, 569, 294 A.3d 1 (2023). In 2006, the plaintiff entered into a foreign exchange prime brokerage agreement and various related agreements with SHI to provide back-office capabilities for foreign exchange trading conducted by Klaud Said, a portfolio manager for SHI. Id., 569–70. From 2006 to 2008, SHI was extremely profitable. Id., 571. Things changed in October 2008[4] when the plaintiff issued a series of margin calls to SHI.[5] Id., 576.

---

[3]As our Supreme Court noted in a related appeal, SHI was "run from an office annex attached to [Alexander's] home in Greenwich." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 346 Conn. 564, 569, 294 A.3d 1 (2023).

[4]As our Supreme Court observed in a related appeal, a "global financial crisis unfolded in the autumn of 2008 . . . ." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 331 Conn. 379, 381, 204 A.3d 664 (2019); see also *Parkcentral Global Hub Ltd.* v. *Porsche Automobile Holdings SE*, 763 F.3d 198, 204 (2d Cir. 2014) ("the global financial crisis became increasingly serious in late October 2008").

[5]"A margin call is a demand by a broker that an investor deposit additional cash or securities to eliminate or reduce a margin deficiency. . . . A margin deficiency results when the equity in an investor's account is less than that required by law to support the account's liabilities. . . . The purpose of margin call rules is to protect brokers from the risks

On October 7, 2008, Alexander met with the plaintiff's bank officials, who informed him that SHI's holdings with the plaintiff totaled approximately $974 million. Id., 572. During the week of October 13, the plaintiff's employees that administered SHI's accounts "scrambled to properly calculate the risk on . . . [its] trades, which led to . . . massive margin calls during the week ahead." (Internal quotation marks omitted.) Id., 576. From October 13 to 17, SHI received multiple margin calls totaling approximately $511 million, which it paid with assets held by the plaintiff. Id., 577–78.

Confusion thereafter arose as to the precise amount of SHI assets held by the plaintiff. As our Supreme Court recounted: "After satisfying the fifth margin call, due to the information provided by [the plaintiff] on October 7 indicating total holdings of approximately [$974] million, [Alexander] thought SHI had several [hundred million dollars] left in its [accounts with the plaintiff] . . . . [At trial, Alexander's] experts calculated that assets worth approximately $280 million should have remained in the [accounts] as of October 21 . . . [a figure that the plaintiff] did not contest . . . .

"Between October 17, and October 21, [2008, the plaintiff] did not make another margin call . . . . [An officer with the plaintiff] stated in [an] internal correspondence that [as of October 21] minimal SHI trades remained in its system, and everything seeme[d] good . . . . However, at the same time, the team responsible for setting the margins discovered that the SHI cash balance in [the plaintiff's] system was not [accurately] reflecting the payments being made in connection with SHI's futures trading . . . .

associated with insufficiently secured accounts, and to prevent customers from carrying vast exposure in their accounts without adequate capital to cover their positions. . . . If investors fail to meet margin calls in their accounts, their brokers, pursuant to contract, may liquidate their positions to satisfy the margin calls." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Advest, Inc.*, 244 Conn. 732, 738 n.4, 714 A.2d 649 (1998).

"In an internal . . . teleconference on October 22 . . . [the plaintiff's] officers realized that, because of [a] failure to properly evaluate and enter . . . [the] trades [made by SHI's portfolio manager], SHI's account balances had been overstated by at least . . . $320 million, leaving SHI underwater by hundreds of millions of dollars. . . . [The plaintiff's officers] on the call agreed to tell . . . [Alexander] that they had performed a reconciliation [that] had identified a shortfall but not to explain [the plaintiff's] mistakes. The call transcript, however, shows that [they] had not performed a reconciliation; they had [merely] identified an error in [the plaintiff's] systems.

"Later on October 22 . . . [Alexander] participated in two high-level telephone calls with [the plaintiff's officials] in which he was informed that the correction of computational errors in SHI's accounts revealed that [there] was in fact [a] deficit and that, as a result, [the plaintiff] was seeking a further margin payment of $300 million to $350 million. . . . When [the plaintiff] informed . . . [Alexander] that there was a deficit of [approximately $300 million to $350 million] in the accounts . . . [Alexander] . . . was plainly shocked. When . . . [Alexander] asked how this was possible, [an officer with the plaintiff] told him [the plaintiff] had been counting things possibly slightly incorrectly but did not explain the cause of the error." (Footnote omitted; internal quotation marks omitted.) Id., 578–79. Following those telephone calls, SHI received an additional margin call from the plaintiff for more than $300 million, which it did not satisfy. Id., 579–80.

In January 2009, the plaintiff commenced an action against SHI in the Queen's Bench Division of the High Court of Justice of England and Wales to collect amounts owed pursuant to the unpaid margin call, as well as interest and costs. Id., 580. In response, SHI asserted counterclaims against the plaintiff and various defenses. Id. Following a trial, the court found in favor of the plaintiff on its claims for damages and rejected SHI's counterclaims and defenses in a 431 page decision issued

on November 8, 2013. Id. The court rendered judgment in favor of the plaintiff in the amount of \$243,023,089 plus interest (English judgment). Id., 580–81.

When SHI failed to pay that judgment, the plaintiff commenced an action on December 20, 2013, against SHI and Alexander in Connecticut to enforce the English judgment (2013 action).[6] Id., 581. In its two count complaint, the plaintiff "sought a declaratory judgment piercing SHI's corporate veil and holding [Alexander] jointly and severally liable with SHI for the English judgment. It also sought to enforce the English judgment against [Alexander] under the Uniform Foreign Money-Judgments Recognition Act [(act)], General Statutes § 50a-30 et seq."[7] Id.

While the 2013 action to pierce the corporate veil was pending, the plaintiff filed a petition in the Oslo Court of Probate, Bankruptcy, and Enforcement in Norway (Oslo Enforcement Court) to enforce the English judgment in Norway (Norway enforcement action). The Oslo Enforcement Court issued a decision on April 13, 2016, in which it recognized the English judgment as an enforceable judgment in Norway. The plaintiff then filed a petition in the Oslo Enforcement Court to execute a lien on the shares of Confirmit AS (Confirmit), a Norwegian software company.

---

[6]The plaintiff registered the English judgment with the Connecticut Superior Court on December 10, 2013.

[7]That statutory claim was premised on the plaintiff's veil piercing claim. As the trial court noted in its memorandum of decision in the 2013 action, a party generally cannot be held liable for a foreign judgment under the act unless it was a party to the foreign action. *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, Docket No. CV-13-5014167-S, 2021 WL 4482154, *26 (Conn. Super. September 7, 2021), aff'd, 346 Conn. 564, 294 A.3d 1 (2023); see also General Statutes § 50a-33 ("a foreign judgment meeting the requirements of section 50a-32 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money"). The court further explained that an exception to that general rule exists, stating: "Connecticut courts have enforced [a foreign] judgment against a person or entity where piercing the corporate veil of the judgment defendant is appropriate." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, *26. The court thus reasoned that Alexander could be held liable under the act if the plaintiff established its veil piercing claim. Id., *27.

In 2008, SHI owned 100 percent of the shares of Confirmit. In October 2008, Alexander caused SHI to transfer approximately one billion dollars of assets out of SHI (October 2008 transfers). See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 575 n.3. Among those assets were all of the shares of Confirmit, which were transferred to Alexander's personal account on October 15, 2008. Alexander allegedly maintained ownership of those shares until 2015. He subsequently transferred the Confirmit shares to his father, Erik Martin Vik (Erik).

On May 31, 2016, the Execution and Enforcement Commissioner in Oslo (commissioner) registered an execution lien on the Confirmit shares. Following a trial, the Oslo Enforcement Court confirmed the validity of that execution lien and held that SHI was the true owner of the Confirmit shares at the time the execution lien was established in 2016. After a series of unsuccessful appeals by Erik, the Supreme Court of Norway, on May 24, 2019, affirmed the Oslo Enforcement Court's determination that SHI was the true owner of the Confirmit shares at the time the execution lien was established.

The plaintiff then filed a petition with the Oslo Enforcement Court seeking a forced sale of the Confirmit shares as part of its efforts to enforce the English judgment. On June 12, 2019, the commissioner granted that petition and, on July 8, 2019, named ABG Sundal Collier ASA (ABG), a Nordic investment bank, as the sales assistant responsible for conducting the sale of the Confirmit shares.

As our Supreme Court noted in *Deutsche Bank AG* v. *Vik*, 349 Conn. 120, 314 A.3d 583 (2024), a prior appeal in this case, "[i]n June, 2019, as part of the sales process, ABG assessed the shares and determined their value to be between $100 and $150 million. During the first phase of the sale, ABG communicated with approximately [seventy-two] potential buyers. By October, 2019, ten interested parties submitted indicative bids for the

[shares].  In November, 2019, during the second phase of the sales process, two companies submitted final bids.

"[In its complaint, the plaintiff] alleges that, as soon as the plaintiff obtained its execution lien in 2016, Alexander, operating through various Vik related entities and family members, engaged in a series of vindictive maneuvers intended to disrupt, delay, and otherwise interfere with the sale.  Specifically, after the Oslo Enforcement Court ruled that SHI was the true owner of the shares, Erik, at the behest of Alexander, filed numerous baseless appeals challenging that determination.  According to the complaint, these appeals, and the uncertainty they created surrounding Confirmit's ownership, caused Confirmit to lose market share and significantly contributed to reduced [bids] that . . . potential purchasers submitted during the sales process . . . .

"The complaint further alleges that, in September, 2017, Erik requested that the execution lien be removed from the Confirmit shares in the VPS registry, the central securities repository in Norway, even though such removal was unlawful.  According to the complaint, [Erik's] request lacked any legitimate basis, and . . . was made in coordination with Alexander . . . in furtherance of the long-running scheme to obstruct [the plaintiff's] ability to recover on the English judgment.  The complaint further alleges that, on January 27, 2020, the Oslo Enforcement Court rejected [Erik's] plea to stop the Confirmit sale [based on the 2017] removal of the execution lien from the VPS registry.  Noting that only the enforcement office may instruct a VPS account operator to delete a registered execution lien, the Oslo Enforcement Court held that the application made [in] September, 2017, by [Erik] for deletion of the execution lien was unlawful.

"Another tactic allegedly utilized by Alexander to disrupt, delay, and otherwise interfere with the sale of the Confirmit shares was to stack Confirmit's board of directors with Vik family members and close associates.  According to the complaint, the plaintiff, fearful that the

newly configured board would deplete Confirmit's assets, filed a petition for a preliminary injunction seeking to have the Viks and their associates removed from the board. On March 30, 2017, the Oslo Enforcement Court granted the petition. In doing so, the court expressed concern that allowing the Viks or their associates to remain on Confirmit's board increased the risk that bad faith transactions may be implemented [by them] that reduce the value of the [company]. The court further stated that Alexander . . . has systemically sought to withhold funds from service in payment of creditors by transferring assets and that it must also be concluded that [his] family members and business advisers will act in accordance with [his] wishes. . . .

"The complaint alleges that the plaintiff's fears regarding Alexander's stacking of Confirmit's board were realized in November, 2019, when Caroline, midway through the bidding process for the Confirmit shares, sought to invoke her rights under a sham agreement between her and SHI purporting to grant her an irrevocable right of first refusal (ROFR) to purchase 100 percent of Confirmit's shares. According to the complaint, SHI and Caroline reached this purported agreement on the very same day [that the plaintiff] petitioned . . . to replace Confirmit's board . . . . As further evidence of fraud, the existence of the purported ROFR was not disclosed until July, 2019, in the midst of negotiations to sell [the] Confirmit [shares] and despite SHI's obligations to produce or disclose [any] such [agreement] in the course of various ongoing [litigation] between SHI and [the plaintiff].

"The complaint alleges that, on November 1, 2019, Caroline provided ABG with a copy of the fraudulent ROFR . . . and requested information about [all] offers [to purchase the Confirmit shares, which] she claimed to be entitled to under the [agreement]. According to the complaint, after ABG informed Caroline that, pursuant to Norwegian law, it could not consider the ROFR . . . in connection with the sale of [the] Confirmit [shares] because the . . . agreement was dated after [the plaintiff]

. . . register[ed] its execution lien, Caroline commenced an action against ABG in the United States District Court for the District of Connecticut (Connecticut District Court action) seeking to enforce the fraudulent ROFR and to enjoin the sale of the Confirmit shares. On December 4, 2019, the District Court denied her application for a preliminary injunction. Two days later, Caroline filed another petition, this time with the Oslo Enforcement Court, again seeking to enforce the ROFR. This petition also was denied. On February 11, 2020, the District Court issued an order to show cause why Caroline's action should not be dismissed. In response, Caroline voluntarily dismissed the Connecticut District Court action.

"According to the complaint, Caroline's actions in Connecticut and Norway were timed specifically to interfere with the forced sale of the Confirmit shares and the business expectations of [the plaintiff]. . . . The execution and attempted enforcement of [Caroline's] sham ROFR on which she based her requests for an injunction [were] for the sole purpose of interfering with the . . . sale . . . and had no proper purpose or justification. The complaint alleges that, in a recent court filing in Norway, Hans Eirik Olav, SHI's purported signatory on the ROFR, stated that he has no recollection of ever entering into a ROFR agreement with Caroline and that the document appears to him to be a forgery.

"Another tactic allegedly utilized by Alexander to disrupt, delay, or otherwise interfere with the sale of the Confirmit shares was the submission of a fraudulent bid to purchase the shares. The complaint alleges that, on October 18, 2019, [a]fter ABG initiated the first phase of the Confirmit sale process, [Alexander] submitted an all-cash indicative bid to acquire the Confirmit shares for $325 million. He did so . . . in an effort to disrupt the sale process, which he intentionally manipulated by submitting [the] false bid under the cover of yet another shell company, Xcelera, Inc. (Xcelera), a company Alexander knew could never have realistically advanced [$325

million to purchase the Confirmit shares]. According to the complaint, Alexander's bid, which was exponentially higher than [Confirmit's] estimated value, was not a serious [bid] . . . .

"The complaint further alleges that ABG informed Alexander that [t]he situation with Xcelera . . . as a potential buyer . . . [when] the validity of the sales process is being challenged by legal persons and individuals associated with [that company], requires certain specific procedures to be complied with and measures to be taken in order to ensure [the integrity of the sales process]. . . . Concerned that Xcelera was controlled by Alexander, ABG requested that he provide information regarding Xcelera's ownership structure, board members, employees, and proof that it had sufficient funds to purchase the Confirmit shares. ABG also sought confirmation that Xcelera, SHI, and Alexander would not challenge the legality of the sales process. According to the complaint, no such information or assurances were forthcoming from Alexander. Instead, Alexander responded to ABG's request for information by asking ABG how it intended to deal . . . with the rights of first refusal that exist [in connection with] the Confirmit shares. . . .

"The complaint finally alleges that, [f]ollowing their repeated attempts to disrupt and otherwise interfere with the Confirmit sale process, the defendants succeeded in driving down both the indicative bids and final sale price for [the company]. Specifically, the complaint alleges that, [a]s a direct result of the defendants' misconduct, the value of Confirmit, which was originally projected to be between $100 . . . and $150 million, fell to only $65 million, reducing the amount of debt that [the plaintiff] was able to recover by tens of millions of dollars. According to the complaint, Verdane, a European capital fund that ultimately purchased the Confirmit shares, sent ABG a letter [on December 3, 2019] articulating its growing concerns about acquiring a company to which [Alexander] and related parties claimed rights. Specifically, Verdane noted that the purported ROFR, the

[Connecticut] District Court [action], and the unlawfully deleted registration of the execution lien all contributed to what [it] perceived to be an increased risk of acquiring Confirmit. The final agreed on price when the sale finally closed on February 14, 2020, was $65 million, which was $5 million less than Verdane's final offer in November, 2019, and $35 million to $85 million less than the price ABG had placed on the shares in June, 2019." **(Internal quotation marks omitted.)** Id., 125–30.

Months after the sale of the Confirmit shares closed, the plaintiff commenced the present action in June 2020.[8] In its two count complaint, the plaintiff alleged tortious interference with business expectancy and CUTPA violations on the part of the defendants due to their alleged efforts to interfere with the sale of the Confirmit shares. The plaintiff further alleged that the defendants' conduct "depressed the value of the Confirmit shares," which prevented the plaintiff "from recovering up to $85 million of [the English judgment] debt."

On October 22, 2020, the defendants filed a motion to dismiss the present action, in which they argued that the litigation privilege deprived the court of subject matter jurisdiction over the plaintiff's action because the plaintiff's claims were predicated on communications made and actions taken in prior judicial proceedings.[9] The trial court denied that motion. The defendants then filed an interlocutory appeal with this court, which reversed the judgment of the trial court and concluded

---

[8] At that time, the trial in the 2013 action had concluded, but no decision had been rendered by the trial court. See *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 123 (noting that plaintiff commenced present case "[w]hile [the 2013 action] was pending in the trial court"); *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, Docket No. CV-13-5014167-S, 2021 WL 4482154, *1 (Conn. Super. September 7, 2021) ("trial before this court [in the 2013 action] was held over five days in November and December 2019"), aff'd, 346 Conn. 564, 294 A.3d 1 (2023).

[9] In separate motions to dismiss filed that same day, the defendants argued that the court lacked personal jurisdiction over Alexander and that the plaintiff's action should be dismissed pursuant to both the prior pending action doctrine and the forum non conveniens doctrine. The defendants subsequently withdrew those motions.

that the litigation privilege barred the plaintiff's tortious interference and CUTPA claims. See *Deutsche Bank AG* v. *Vik*, 214 Conn. App. 487, 281 A.3d 12 (2022), rev'd, 349 Conn. 120, 314 A.3d 583 (2024). Our Supreme Court granted the plaintiff's petition for certification to appeal and thereafter concluded, "construing the complaint in the light most favorable to the plaintiff," that this court had improperly determined that the plaintiff's claims were barred by the litigation privilege. *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 139–40. The Supreme Court thus reversed the judgment of this court and remanded it to this court with direction to affirm the judgment of the trial court. Id., 148.

At the time of those appeals before this court and our Supreme Court, a concurrent appeal arose regarding the 2013 action to pierce the corporate veil of SHI. In its complaint in the 2013 action, the plaintiff alleged in relevant part that, "on or before October 9, 2008, and through October 30, 2008, [Alexander] caused SHI to transfer funds to him and other entities owned and controlled by him and/or his immediate family in order to shield SHI's assets from [the plaintiff] . . . . Through his domination and control of SHI, [Alexander] caused SHI to breach its contractual obligations to [the plaintiff] and to fraudulently convey funds to third parties for the inequitable purpose of shielding SHI's assets and defrauding [the plaintiff] out of [money] owed." The plaintiff thus sought a declaratory judgment piercing SHI's corporate veil and holding Alexander jointly and severally liable with SHI for the English judgment.

A five day trial on the 2013 action was held in late 2019. In a subsequent memorandum of decision dated September 7, 2021, the court found that, under Turks and Caicos Islands law, a plaintiff seeking to pierce a corporate veil "must demonstrate three things: (1) domination and control of the corporation by the alleged wrongdoer, (2) commingling of the corporation's assets with those of the wrongdoer or with entities controlled by him, and (3)

specific intent by the wrongdoer to leave the corporation unable to pay its debts. Applying this standard to the evidence adduced at trial, the trial court concluded that [the plaintiff] had met the first two prongs of the test. The court found that the evidence established unequivocally that SHI had no separate mind of its own from [Alexander] and that [Alexander] completely dominated and controlled SHI. The court also found that the evidence established that [Alexander] regularly used SHI funds for personal expenses and pet projects and regularly transferred massive funds between [SHI] and his other companies without any formality at all, as if transferring money from one pocket to another." (Internal quotation marks omitted.) *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 583–84. The court nevertheless concluded that the plaintiff had "failed to satisfy its burden of proof to justify piercing SHI's corporate veil and that [Alexander] diverted SHI's assets with the specific intent of rendering it unable to pay its margin calls to [the plaintiff]." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, Docket No. CV-13-5014167-S, 2021 WL 4482154, *1 (Conn. Super. September 7, 2021), aff'd, 346 Conn. 564, 294 A.3d 1 (2023). More specifically, the court concluded that the plaintiff had failed to demonstrate that Alexander "acted with the specific intent to leave SHI unable to pay its debts to [the plaintiff]" when he caused SHI to transfer approximately one billion dollars of assets out of SHI in October 2008. *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 584; see also id., 575 n.3. Accordingly, the trial court "rejected [the plaintiff's] claim that [Alexander] should be held personally liable for the English judgment." Id., 583.

From that judgment, the plaintiff filed an appeal with this court, which was transferred to our Supreme Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. In a decision released on May 30, 2023, our Supreme Court affirmed the judgment of the trial court. Id., 604. In so doing, the court concluded that the trial court properly "declined to pierce SHI's corporate veil

and to hold [Alexander] jointly and severally liable with SHI for the English judgment."[10] Id., 569.

That decision, in turn, precipitated the summary judgment that underlies this appeal. On remand to the trial court following our Supreme Court's determination that the plaintiff's tortious interference with business expectancy and CUPTA claims in the present case were not barred by the litigation privilege; see *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 139–48; the defendants filed a motion for summary judgment. In that motion, the defendants argued that the doctrines of res judicata and collateral estoppel barred the plaintiff's action. That motion was accompanied by a memorandum of law and several exhibits.[11] The plaintiff filed an opposition to the motion for summary judgment, as well as a memorandum of law. The defendants filed a reply to that opposition, and the court held a hearing on the motion for summary judgment on December 4, 2024.

In its subsequent memorandum of decision, the court first concluded that all four elements of res judicata; see *Solon* v. *Slater*, 345 Conn. 794, 825, 287 A.3d 574 (2023); had been met. The court thus granted the motion for summary judgment on that ground "as to both defendants."[12] In addition, the court stated that the motion for summary judgment "on the ground that such claims are barred by the doctrine of collateral estoppel is granted in part, denied in part. [The plaintiff] is collaterally estopped from relitigating the following issues: (1) the personal liability of [Alexander] to [the plaintiff] under the English judgment and the enforcement of the English judgment against him; (2) whether the transfer of SHI's assets, including shares of Confirmit from

---

[10]The court also rejected the plaintiff's evidentiary challenge regarding the admission of certain testimony from Alexander at trial in the 2013 action. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 595–604.

[11]Those exhibits included copies of various pleadings from the 2013 action.

[12]In so concluding, the court summarily stated that Caroline, who was not a party to the 2013 action, "is in privity with [Alexander]."

SHI to [Alexander] in October 2008, was proper; and (3) that [Alexander] was the owner of the Confirmit shares in October 2008. It is denied as to all other remaining issues." Accordingly, the court rendered summary judgment in favor of the defendants, and this appeal followed.

As a preliminary matter, we note certain well established principles that are relevant to our consideration of the plaintiff's claims. Res judicata and collateral estoppel are doctrines of preclusion; see generally *Tracey* v. *Miami Beach Assn.*, 216 Conn. App. 379, 390–92, 288 A.3d 629 (2022), cert. denied, 346 Conn. 919, 291 A.3d 1040 (2023); that are "judicially created rules of reason . . . enforced on public policy grounds . . . ." (Internal quotation marks omitted.) *Weiss* v. *Weiss*, 297 Conn. 446, 460, 998 A.2d 766 (2010). "The doctrines of collateral estoppel and res judicata, also known as issue preclusion and claim preclusion, respectively, have been described as related ideas on a continuum. . . . Both doctrines share common purposes, namely, to protect the finality of judicial determinations, [to] conserve the time of the court, and [to] prevent wasteful litigation . . . ." (Citation omitted; internal quotation marks omitted.) *Solon* v. *Slater*, supra, 345 Conn. 810. Collateral estoppel and res judicata are grounded in "the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." *State* v. *Ellis*, 197 Conn. 436, 465, 497 A.2d 974 (1985). At the same time, our Supreme Court has cautioned that those doctrines of preclusion "should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318, 460 A.2d 1277 (1983). Notable among those other policies is a party's interest in the vindication of a just claim. See, e.g., *Isaac* v. *Truck Service, Inc.*, 253 Conn. 416, 422, 752 A.2d 509 (2000).

"It is well established that res judicata and collateral estoppel are affirmative defenses that may be waived if

not properly pleaded." *Singhaviroj* v. *Board of Education*, 124 Conn. App. 228, 233, 4 A.3d 851 (2010); see also *M&T Bank* v. *Lewis*, 349 Conn. 9, 19 n.6, 312 A.3d 1040 (2024) ("a claim that an action or claim is barred by res judicata or collateral estoppel must be raised in the trial court through appropriate pleadings"). The party asserting a defense of res judicata or collateral estoppel bears the burden of establishing its applicability. See *State* v. *Knight*, 266 Conn. 658, 664, 835 A.2d 47 (2003); *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 195, 629 A.2d 1116 (1993). The applicability of res judicata or collateral estoppel in a given case presents a question of law, over which our review is plenary. See *Independent Party of CT-State Central* v. *Merrill*, 330 Conn. 681, 712, 200 A.3d 1118 (2019).

## I
## RES JUDICATA

We begin with the plaintiff's challenge to the court's application of the doctrine of res judicata. The plaintiff contends that the court improperly granted the motion for summary judgment on that ground "as to both defendants," despite the fact that the defendants did not plead that defense with respect to Caroline, and that it improperly concluded that Caroline was in privity with Alexander. The plaintiff also argues that the court improperly concluded, with respect to Alexander, that no genuine issue of material fact existed as to whether res judicata barred the plaintiff's claims. We agree.

### A
### 1

It is well established that, "[u]nder Connecticut law, the doctrine of res judicata is pleaded as a special defense." *Tracey* v. *Miami Beach Assn.*, supra, 216 Conn. App. 392; see also Practice Book § 10-50 (res judicata is special defense that "must be specially pleaded"); *Beccia* v. *Waterbury*, 185 Conn. 445, 451, 441 A.2d 131 (1981) ("[a] prior judgment which would be a bar to a later

action, as res adjudicata, is a defense which must be specially pleaded by the party who seeks its benefit"). When a party fails to plead that defense, it is subject to waiver. See *Singhaviroj* v. *Board of Education*, supra, 124 Conn. App. 233.

At no time since the commencement of this action in 2020 have the defendants filed an answer to the plaintiff's complaint. Instead, they first moved to dismiss the action on various grounds, including the litigation privilege, which culminated in the decision of our Supreme Court in *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 120. Following a remand for further proceedings, the defendants then filed a motion for summary judgment, as was their prerogative. See Practice Book § 17-44 ("any party may move for a summary judgment as to any cause of action or defense as a matter of right at any time if no scheduling order exists and the case has not been assigned for trial"); *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 867 n.8, 675 A.2d 441 (1996) ("a party may move for summary judgment at any time"); *Nash* v. *Roland Dumont Agency, Inc.*, Docket No. CV-18-5018054-S, 2018 WL 6721442, *1 (Conn. Super. November 21, 2018) ("[p]rior to filing an answer, the defendants filed a motion for summary judgment, as permitted by Practice Book § 17-44"). In the heading to part III B of their memorandum of law in support of their motion for summary judgment, the defendants stated: "The Claims Made in This Case Against [Alexander] are Barred by the Doctrine of Res Judicata."[13]

---

[13]We note that, after stating that the plaintiff's claims against Alexander were barred by the doctrine of res judicata and reciting familiar precepts of that doctrine, the defendants curiously stated: "Consideration of the four elements of res judicata demonstrates conclusively that it applies to bar both counts of the 2020 complaint against the [defendants]." The defendants then proceeded to apply the four elements of res judicata with respect to Alexander, noting that "both [the plaintiff] and [Alexander] were parties to the [2013 action] and are parties in this case." Notably, the defendants did not discuss Caroline in the res judicata portion of their memorandum of law in support of their motion for summary judgment and did not argue that she was in privity with a party to the 2013 action.

In its opposition to the motion for summary judgment, the plaintiff argued that Caroline was neither a party to the 2013 action nor in privity with the parties to that action. It further noted that it was "unclear whether the defendants contend that res judicata bars the claims against [Caroline]. The heading of their res judicata argument states only that the claims against [Alexander] are barred." The plaintiff further argued that "res judicata cannot bar [the plaintiff's] claims against [Caroline]" in the present case.

In their November 1, 2024 reply to the plaintiff's opposition, the defendants clarified that they "have not advanced a claim that res judicata applies to bar the present claims against [Caroline]. Rather, the claims against her are barred by the doctrine of collateral estoppel." For that reason, the plaintiff's counsel apprised the court at the December 4, 2024 hearing on the motion for summary judgment that the defendants "are not asserting [res judicata] on behalf of [Caroline] but only [Alexander]."[14] In its subsequent memorandum of decision, the court nevertheless granted the motion for summary judgment "on the ground that [the plaintiff's] claims are barred by the doctrine of res judicata *as to both defendants*." **(Emphasis added.)**

That determination cannot be reconciled with the record before us, particularly the defendants' averment in their November 1, 2024 reply to the plaintiff's opposition that they were not pleading res judicata with respect to Caroline. Because the defendants did not plead that special defense with respect to Caroline at any time before the trial court and expressly indicated that they were

---

[14]Because the defendants never offered argument or evidence to support a res judicata defense with respect to Caroline—as the plaintiff reminded the court in its October 11, 2024 opposition to the defendants' motion for summary judgment and at the December 4, 2024 hearing on that motion—this is not a case in which the court properly could consider that defense despite the defendants' failure to specifically plead it. See *Singhaviroj* v. *Board of Education*, supra, 124 Conn. App. 234.

not asserting such a defense on her behalf, we agree with the plaintiff that the defendants waived that defense.

2

We also disagree with the two distinct determinations made by the court regarding the privity element of res judicata.

a

In its memorandum of decision, the court found that "[t]here is . . . *no dispute* that [the privity requirement is] met." (Emphasis added.) The record indicates otherwise. First, the defendants never alleged in their August 27, 2024 motion for summary judgment and accompanying memorandum of law, their November 1, 2024 reply to the plaintiff's opposition, or their argument at the December 1, 2024 hearing on the motion for summary judgment, that Caroline was in privity with either Alexander or SHI. Second, in its opposition to the motion for summary judgment, the plaintiff specifically argued that "the parties to the [2013 action] are *not* . . . in privity with the parties in this action." (Emphasis added.) In its reply to that opposition, the defendants averred that they "have not advanced a claim that res judicata applies to bar the present claims against [Caroline]." That record belies the court's determination that there was "no dispute" that the privity requirement was satisfied in the present case.

b

Also untenable is the court's determination that "[Caroline] is in privity with [Alexander]." The court offered no analysis or explication of that element of res judicata. As our Supreme Court has observed, "[p]rivity is a difficult concept to define precisely. . . . There is no prevailing definition of privity to be followed automatically in every case. It is not a matter of form or rigid labels; rather it is a matter of substance. In determining whether privity exists, we employ an analysis that focuses on the functional relationships of the parties. Privity is not established by the mere fact that persons may be interested in

the same question or in proving or disproving the same set of facts. Rather, it is, in essence, a shorthand statement for the principle that [the doctrines of preclusion] should be applied only when there exists such an identification in interest of one person with another as to represent the same legal rights so as to justify preclusion." (Citation omitted.) *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 813–14, 695 A.2d 1010 (1997). "A key consideration in determining the existence of privity is the sharing of the same legal right by the parties allegedly in privity." (Internal quotation marks omitted.) Id., 813. "[O]ne person is in privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between the two as to represent the same legal right . . . ." (Internal quotation marks omitted.) *Collins* v. *E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994); cf. *Wheeler* v. *Beachcroft, LLC*, 320 Conn. 146, 167, 129 A.3d 677 (2016) ("[b]ecause parties may share some legal rights and not others, parties may be in privity with respect to some claims, but not others, for res judicata purposes").

The 2013 action concerned Alexander's conduct in transferring assets from SHI during the 2008 financial crisis. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 564. Caroline had no legal interest in that action—she was not a party, and it did not concern her conduct in any way. The issue in the 2013 action was whether the plaintiff had the legal right to pierce the corporate veil of SHI and hold Alexander, the sole director of SHI who controlled all aspects of its operations and financial transactions, personally liable for the English judgment due to his conduct. In resolving that issue, the critical question was whether Alexander "acted with the specific intent to leave SHI unable to pay its debts to [the plaintiff]" when he caused SHI to transfer approximately one billion dollars of assets out of SHI in October 2008. Id., 584. The present case, by contrast, concerns the defendants' alleged efforts to interfere with the sale of the Confirmit shares beginning

in 2016. The issue in this case is whether that conduct constitutes tortious interference with business expectancy and violations of CUTPA.

Given those critical distinctions, we conclude that Caroline does not share the same legal right in this action as that which belonged to Alexander in the 2013 action. There is no allegation that Caroline had any connection to SHI or that she engaged in any conduct with respect to that entity at any time. Accordingly, she lacks the requisite identification of interest with Alexander with respect to the issues adjudicated in the 2013 action. The court, therefore, improperly concluded that Caroline is in privity with Alexander for res judicata purposes.

### B

We next consider whether the court properly concluded that no genuine issue of material fact existed as to whether res judicata barred the plaintiff's claims with respect to Alexander. "Generally, for res judicata to apply, four elements must be met: (1) the judgment must have been rendered on the merits by a court of competent jurisdiction; (2) the parties to the prior and subsequent actions must be the same or in privity; (3) there must have been an adequate opportunity to litigate the matter fully; and (4) the same underlying claim must be at issue." *Wheeler* v. *Beachcroft, LLC*, supra, 320 Conn. 156–57. In the present case, the first two elements are not in dispute. We therefore focus our attention on the third and fourth elements of that doctrine of preclusion.

### 1

We begin with the question of whether the present case involves the same claim as the 2013 action. For res judicata to apply, the same underlying claim must be at issue. Id., 157. Our Supreme Court has adopted a transactional test "as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first

action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction, and what groupings constitute a series, are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." (Internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 604, 922 A.2d 1073 (2007); see also 1 Restatement (Second), Judgments § 24, comment (b), pp. 198–99 (1982) (transactional test "is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases").

The purpose of the transactional test is "to measure the preclusive effect of a prior judgment"; *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 365, 511 A.2d 333 (1986); so as to "strike a delicate balance between . . . the interests of the defendant and of the courts in bringing litigation to a close and . . . the interest of the plaintiff in the vindication of a just claim." (Internal quotation marks omitted.) *Cadle Co.* v. *Gabel*, 69 Conn. App. 279, 298, 794 A.2d 1029 (2002). It operates as a screening mechanism to prevent a party from obtaining "a second bite at the apple . . . [when] the present claims are ones arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not in the [prior action]." (Internal quotation marks omitted.) *Larry* v. *Powerski*, 148 F. Supp. 3d 584, 597 (E.D. Mich. 2015).

"In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action."[15] (Internal quotation

[15]For that reason, the defendants' argument that the plaintiff "provided no evidence at all of any of the proceedings" in the Norway enforcement action is of no moment. The issue before the court on summary judgment was not whether the defendants committed the acts alleged

marks omitted.) *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 590, 674 A.2d 1290 (1996). The 2013 action was brought to pierce the corporate veil of SHI and hold Alexander personally liable for the English judgment against it. The facts giving rise to that action pertain to Alexander's conduct as the sole director of SHI who controlled all aspects of its operations and financial transactions. More specifically, the 2013 action concerned the transfer of approximately one billion dollars of assets out of SHI in October 2008 at Alexander's direction. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 583–84. The present case, by contrast, does not concern Alexander's actions in 2008, his liability for the English judgment, or the transfer of the Confirmit shares from SHI. Rather, it pertains to the defendants' alleged interference with the court-ordered sale of those shares years later. As our Supreme Court observed in an earlier appeal in this case: "The [2013 action] involved the narrow question of whether the trial court could pierce SHI's corporate veil and hold Alexander personally liable for the English judgment on the basis of conduct occurring prior to November 1, 2008. . . . The present case involves whether the defendants were involved in a conspiracy between 2016 and 2020 to halt or delay the sale of a Norwegian software company in order to prevent the plaintiff from partially satisfying

---

with respect to the Norway enforcement action; the issue was whether the affirmative defenses of res judicata and collateral estoppel barred the plaintiff's action. In resolving that query, the court necessarily compared the complaint and judgment in the 2013 action with the allegations of the complaint in the present case.

Furthermore, as we previously noted, the defendants did not file an answer prior to moving for summary judgment and thus have not denied the allegations contained in the plaintiff's complaint regarding those foreign proceedings. They likewise did not dispute the material allegations in the plaintiff's complaint regarding the Norway enforcement action in their motion for summary judgment but, rather, argued that res judicata and collateral estoppel barred the plaintiff's action. In its memorandum of decision, the court neither noted nor attributed any significance to the fact that the plaintiff had not submitted documentation from the Norway enforcement action. Instead, the court relied on the allegations set forth in the plaintiff's complaint.

the English judgment." (Citation omitted.) *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 136.

In addition, the present case involves a distinct and separate injury from that alleged in the 2013 action—the alleged loss of $85 million stemming from the diminution in value of the Confirmit shares due to the conduct of the defendants between 2016 and 2020. See, e.*g.*, *Summitwood Development, LLC* v. *Roberts*, 130 Conn. App. 792, 804, 25 A.3d 721 (res judicata barred second action because claims arose from same facts and sought redress for same injury), cert. denied, 302 Conn. 942, 29 A.3d 467 (2011), cert. denied, 565 U.S. 1260, 132 S. Ct. 1745, 182 L. Ed. 2d 530 (2012); cf. *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 350–51, 15 A.3d 601 (2011) (res judicata barred plaintiff's misrepresentation and CUTPA claims because "the facts and theories . . . alleged in the [prior action and the present action] were the same" and "*all* of the allegations and theories asserted in both actions were intended to support the single underlying claim" (emphasis in original)). Moreover, the present action involves an additional defendant who (1) was not a party to the 2013 action, (2) had no legal interest in that action, and (3) was not involved in the facts and transactions underlying that action in any manner. In light of the foregoing, we conclude that the material facts of the 2013 action and the present one are not related in time, space, origin, or motivation and do not form a convenient trial unit. See *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 604. For those reasons, the court improperly concluded that the present case involves the same underlying claim as the 2013 action.

2

The plaintiff also claims that the court improperly concluded that the plaintiff had an adequate opportunity to fully litigate the claims advanced in the present action in the 2013 action. We agree.

"[T]he essential concept of the modern rule of claim preclusion is that a judgment against [the] plaintiff is preclusive not simply when it is on the merits but when the procedure in the first action afforded [the] plaintiff a fair opportunity to get to the merits. . . . [T]he appropriate inquiry with respect to [claim] preclusion is whether the party had an *adequate opportunity to litigate the matter in the earlier proceeding* . . . . [T]he doctrine of res judicata does not preclude a plaintiff from pursuing claims that it previously had not been afforded the opportunity to litigate." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Probate Appeal of Cadle Co.*, 152 Conn. App. 427, 437, 100 A.3d 30 (2014). When a party did not have a full and fair opportunity to litigate a matter in the earlier proceeding, "res judicata is inappropriate." *Cayer Enterprises, Inc.* v. *DiMasi*, 84 Conn. App. 190, 194, 852 A.2d 758 (2004).

In its memorandum of decision, the court addressed that element of res judicata as follows: "The court . . . finds that the third element—that there must have been an adequate opportunity to litigate the matter fully—was met. [The plaintiff] had a full and fair opportunity to litigate the enforcement of the English judgment as against [Alexander] relating to the transfer of the Confirmit shares and sufficient assets in SHI in 2008 to pay [the plaintiff], which judgment formed the basis of the [Norway enforcement action]." That reasoning exhibits a fundamental misunderstanding of the claims asserted in this case. Our plenary review of the pleadings; see *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 290, 87 A.3d 534 (2014); indicates that the conduct giving rise to the plaintiff's tortious interference and CUTPA claims is not Alexander's transfer of the Confirmit shares in 2008. Rather, it is the defendants' alleged interference with the forced sale of those shares from 2016, when the Norway enforcement action was commenced, until 2020, when that sale closed.

The claims advanced in the present case require the plaintiff to plead and prove that it sustained damages as

a result of the defendants' interference with the sale of the Confirmit shares. See, e.g., *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.,* 287 Conn. 208, 218, 947 A.2d 320 (2008) ("to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation" (internal quotation marks omitted)); *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 97, 920 A.2d 357 ("[i]t is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss" (internal quotation marks omitted)), cert. denied, 284 Conn. 901, 931 A.2d 261 (2007). In its complaint, the plaintiff alleges that the defendants' efforts to interfere with the sale of the Confirmit shares "depressed [their] value" and thereby prevented the plaintiff from recovering $85 million from that sale.

For that reason, the pecuniary injury allegedly sustained by the plaintiff did not accrue until February 2020, when the sale of the Confirmit shares closed for millions of dollars below ABG's initial valuation. See *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 125–30. As the plaintiff aptly notes in its principal appellate brief, "if the sale of the Confirmit shares had been completed without any diminution in the price caused by [the defendants' alleged conduct], then [the plaintiff] would have had no claim to assert." Put simply, the plaintiff had no case until the court-ordered sale of the Confirmit shares ultimately closed. See, e.g., *Jepsen* v. *Camassar*, 181 Conn. App. 492, 533, 187 A.3d 486 ("[s]peculation and conjecture do not suffice for proof of pecuniary loss"), cert. denied, 329 Conn. 909, 186 A.3d 12 (2018).

We therefore disagree with the defendants that the plaintiff could have amended its complaint in the 2013 action to include tortious interference with business expectancy and CUTPA claims. Significantly, the allegedly tortious conduct of the defendants continued into late 2019—after discovery deadlines had passed, the pleadings had closed, and the trial commenced in the

2013 action on November 19, 2019.[16]  See footnote 8 of this opinion.

We also note that, prior to trial in the 2013 action, the defendants filed a motion in limine to preclude evidence related to conduct outside of the October 2008 time period alleged in the complaint in the 2013 action.  The trial court granted that motion, stating in relevant part: "The court exercises its discretion to maintain the focus of the trial on the transactions occurring in October 2008 as alleged in the complaint.  Given the global extent of [Alexander's] financial dealings, pursuit without time limitation could lead to a virtually endless proceeding." In light of that order and the fact that the plaintiff's causes of action for tortious interference with business expectancy and CUTPA did not accrue until February 2020—months after the trial in the 2013 action concluded—the plaintiff would have been required to obtain permission from the court (1) to amend its complaint posttrial to add those tort and statutory causes of action;

[16]For example, the plaintiff alleges in its complaint in the present case that, as part of the defendants' efforts to interfere with the sale of the Confirmit shares, Caroline commenced the Connecticut District Court action on November 13, 2019, "at a critical moment of negotiations" in the sale of those shares, and that she did not voluntarily dismiss that action until February 11, 2020.  It also alleges that, on December 6, 2019, Caroline filed a petition for a preliminary injunction with the Oslo Enforcement Court to stop the sale of the Confirmit shares.  The plaintiff further alleges that, in a letter dated October 18, 2019, Alexander informed ABG that he intended to bid on the Confirmit shares; that he subsequently refused to comply with ABG's subsequent request for information and documentation related to his purported bid; that, on November 26, 2019, he declared that he "decided to bid for Confirmit [himself]," rather than through a corporate entity; that his bid "was not a serious offer to purchase the Confirmit shares" and "was 400 percent higher than the average of the other indicative bids"; and that "[t]he sole purpose of [Alexander's] bid was to disrupt the Confirmit sale process."

In concluding that res judicata barred the plaintiff's claims in the present case, the court stated: "While some facts in the [present case] relating to the [Norway enforcement action] had not yet occurred at the time the [2013 action] was instituted in 2013, they had occurred *well prior to trial* in the [2013 action] such that they could have been pled in the [2013 action]."  (Emphasis added.)  As the foregoing examples demonstrate, the court was plainly mistaken in that regard.

(2) to add Caroline as a party; (3) to reopen discovery; and (4) to reopen evidence at trial, despite the fact that those claims are utterly distinct from the equitable claim to pierce the corporate veil that the plaintiff pursued in the 2013 action. We are not aware of any case in which such a series of posttrial requests have been granted by a trial court and the defendants have not identified such authority. On the facts and circumstances of this case, we cannot ascribe fault to the plaintiff for failing to seek such extraordinary posttrial recourse.

In light of the foregoing, we conclude that the defendants have not demonstrated that the plaintiff had a full and fair opportunity to litigate its tortious interference with business expectancy and CUTPA claims in the 2013 action. For that reason, res judicata is inappropriate. See *Cayer Enterprises, Inc.* v. *DiMasi*, supra, 84 Conn. App. 194.

3

Lastly, we emphasize that res judicata is a flexible doctrine that "must give way when [its] mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *In re Juvenile Appeal (83–DE),* supra, 190 Conn. 318. As our Supreme Court has observed, "application of the doctrine [of res judicata] can yield harsh results, especially in the context of claims that were not actually litigated and parties that were not actually involved in the prior action. . . . The decision of whether res judicata should bar such claims should be based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim." (Citation omitted; internal quotation marks omitted.) *Wheeler* v. *Beachcroft, LLC,* supra, 320 Conn. 158. In this case, we believe that the public policy goals of "promoting judicial economy, minimizing repetitive litigation, preventing inconsistent judgments and providing repose to parties"; *Weiss* v. *Weiss*, supra,

297 Conn. 465; are outweighed by the plaintiff's interest in the vindication of a just claim. We therefore conclude that the court improperly determined that res judicata barred the plaintiff's tortious interference with business expectancy and CUPTA claims.

## II
## COLLATERAL ESTOPPEL

We next consider the plaintiff's challenge to the court's application of the doctrine of collateral estoppel. In its memorandum of decision, the court concluded that the plaintiff is collaterally estopped from relitigating (1) "the personal liability of [Alexander] to the plaintiff under the English judgment and the enforcement of the English judgment against him," (2) "whether the transfer of SHI's assets, including shares of Confirmit from SHI to [Alexander] in October 2008, was proper," and (3) "that [Alexander] was the owner of the Confirmit shares in October 2008." On appeal, the plaintiff contests the propriety of those determinations.

The doctrine of collateral estoppel expresses "the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest. . . . Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was *actually litigated* and *necessarily determined* in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been *fully and fairly litigated in the first action.* It also must have been *actually decided* and the decision must have been *necessary* to the judgment." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 32, 633 A.2d 1368 (1993); see also *Torrington Tax Collector, LLC* v. *Riley*, 354 Conn. 66, 80, 349 A.3d 551 (2026) (collateral estoppel requires proof that issue was "actually litigated and decided" in prior action); 1 Restatement (Second), supra, § 27, p. 250 ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final

judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim"). Accordingly, to successfully invoke the doctrine of collateral estoppel, a party must demonstrate that (1) the issue was fully and fairly litigated in the prior action, (2) the issue was actually litigated and decided in the prior action, and (3) the issue was necessary to the judgment in the prior action. See *Virgo* v. *Lyons*, 209 Conn. 497, 501, 551 A.2d 1243 (1988); *Busconi* v. *Dighello,* 39 Conn. App. 753, 767–68, 668 A.2d 716 (1995), cert. denied, 236 Conn. 903, 670 A.2d 321 (1996). In this case, the defendants, as the parties asserting the defense of collateral estoppel in a motion for summary judgment, bore the burden of establishing that no genuine issue of material fact existed as to each of those requirements. See *Coyle Crete, LLC* v. *Nevins*, 137 Conn. App. 540, 547–48, 49 A.3d 770 (2012).

## A
### Liability for the English Judgment

In its memorandum of decision, the court concluded that collateral estoppel precluded the plaintiff from relitigating "the personal liability of [Alexander] to the plaintiff under the English judgment and the enforcement of the English judgment against him . . . ." We disagree that collateral estoppel applies to that issue.

The court's determination is rooted in its misunderstanding of the claims asserted by the plaintiff in this case. As previously noted, the alleged conduct that underlies the plaintiff's tortious interference and CUTPA claims does not concern the October 2008 transfers at issue in the 2013 action or any conduct by the defendants related thereto. The plaintiff's tortious interference and CUTPA claims in this case concern the defendants' alleged interference with the court-ordered sale of the Confirmit shares from 2016, when the Norway enforcement action was commenced, to 2020, when that sale closed. The present action is thus predicated

on different conduct regarding a different transaction than those at issue in the 2013 action.

"Before collateral estoppel applies . . . there must be an *identity of issues* between the prior and subsequent proceedings. To invoke collateral estoppel the issues sought to be litigated in the new proceeding must be *identical* to those considered in the prior proceeding." (Emphasis in original; internal quotation marks omitted.) *Corcoran* v. *Dept. of Social Services*, 271 Conn. 679, 689, 859 A.2d 533 (2004); see also *Gladysz* v. *Planning & Zoning Commission*, 256 Conn. 249, 261, 773 A.2d 300 (2001) ("collateral estoppel has no application in the absence of an identical issue"). The issue sought to be litigated in the present case—whether the defendants interfered with the court-ordered sale of the Confirmit shares from 2016 to 2020—differs dramatically from the issues presented in the 2013 action to pierce the corporate veil, which concerned whether Alexander exercised dominion and control over SHI, whether he commingled its assets with his own, and whether he instigated the October 2008 transfers with the specific intent of rendering SHI unable to pay its margin calls to the plaintiff. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 584. In such instances, collateral estoppel has no application.

Moreover, we note that the trial court in the 2013 action concluded that, because the plaintiff failed to demonstrate that Alexander acted with the specific intent necessary to pierce the corporate veil, he could not be held personally liable for the English judgment. See id., 583–84. In the present action, the plaintiff has not contested that determination and does not seek to hold Alexander personally liable for the English judgment. As our Supreme Court observed in an earlier appeal in this case, "[t]he present action . . . is not predicated on the English court's findings; nor does it seek to impose liability on the defendants for anything that transpired in that case." *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 141 n.5. Whether Alexander may be held personally

liable for the English judgment, therefore, is irrelevant to the present action.

## B
### October 2008 Transfers

In its memorandum of decision, the court concluded that collateral estoppel precluded the plaintiff from relitigating "whether the transfer of SHI's assets, including shares of Confirmit from SHI to [Alexander] in October 2008, was proper . . . ." We do not agree.

As our Supreme Court explained, "[e]ven when an issue is actually litigated and decided in a prior action, collateral estoppel does not apply unless the trial court's adjudication of that issue was necessary to the judgment. . . . [A]n issue is necessary to the judgment if, in the absence of a determination of the issue, the judgment could not have been validly rendered. . . . If an issue has been determined, but the judgment is not dependent [on] the determination of the issue, the parties may relitigate the issue in a subsequent action. . . . Findings on nonessential issues usually have the characteristics of dicta." (Citations omitted; internal quotation marks omitted.) *Torrington Tax Collector, LLC* v. *Riley*, supra, 354 Conn. 80.

The introductory paragraph to the trial court's memorandum of decision in the 2013 action indicates that the central question in that action was whether the plaintiff satisfied "its burden of proof to justify piercing SHI's corporate veil [because Alexander] diverted SHI's assets with the specific intent of rendering it unable to pay its margin calls to [the plaintiff]." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 2021 WL 4482154, *1. In resolving that question, the court expressly adopted a tripartite test to determine whether the piercing of SHI's corporate veil was justified, which required proof that Alexander (1) exercised dominion and control of SHI, (2) commingled SHI's assets with his own, and (3) drained SHI's assets "with the specific intent of leaving the corporation unable to pay its debts." Id., *19–20. The

court further determined that "the test of specific intent requires a subjective finding of a defendant's 'conscious object' to commit the harm alleged, in this case, i.e., that [Alexander] consciously sought to render SHI unable to satisfy its margin calls from [the plaintiff]." Id., *22.

Applying that tripartite test, the court found that the plaintiff had satisfied its first two prongs, stating in relevant part: "[T]he court does not hesitate to conclude that, as to the [October 2008 transfers], SHI had no separate mind of its own or that [Alexander] completely dominated and controlled SHI. . . . [T]he court finds that [the plaintiff] provided ample evidence of commingling between SHI, [Alexander] and entities he controlled." Id., *28–29. The court nevertheless found, with respect to the third prong of that test, that Alexander did not act with the specific intent to render SHI unable to pay its margin calls to the plaintiff. Id., *31.

In reaching that determination, the court reasoned: "[O]ne salient fact stands out: [Alexander] left more than $500 million in SHI's accounts at [the plaintiff]. In fact, he could have credibly believed that he had retained as much as $780 million in SHI's accounts at [the plaintiff]. SHI used this money to cover the first five margin calls during the week of October 13. [The plaintiff's] contention that [Alexander] drained SHI's assets with the specific intent of rendering it unable to pay its margin calls is undermined by this salient fact, which [the plaintiff] chooses to ignore. If [Alexander] had specifically intended to prevent payment of SHI's debts to [the plaintiff], he went about it in a remarkably incompetent way, and [Alexander] did not strike the court as financially incompetent.

"Further, [Alexander] had no reason to think that the margin calls would exceed the nominal $780 million remaining in SHI's accounts at [the plaintiff]. The defendants' forensic accountant [testified] that '[i]t took an army of quants' to calculate the final balance of [the] derivative trades [made by SHI's portfolio manager] and that it was unlikely [Alexander] could have calculated

it.[17] . . . [The plaintiff] cannot successfully contend that [Alexander] acted with specific intent to deprive it of funds when he initiated the [October 2008 transfers] at a time when neither he nor [the plaintiff] knew the extent of the losses that were eventually calculated.

"Ultimately, [Alexander's] purpose in directing the [October 2008 transfers] is irrelevant to the decisive issue in this case, considering that he actually reserved over half a billion dollars to cover SHI's unspecified debts to [the plaintiff], if not as much as $780 million. This was not an unreasonable action given what he knew at the time."[18] (Footnote in original.) Id., *30–31. The court further found that, at the time that various assets were transferred from SHI in October 2008, Alexander "credibly believed" that SHI's assets held by the plaintiff "totaled at least $1.65 billion and [he] had no reason to believe the remainder of approximately $750 million would be inadequate to cover any debt to [the plaintiff]." Id., *31. For that reason, the court concluded that the plaintiff "has not satisfied its burden of proof that, in making the [October 2008 transfers], [Alexander] acted with the specific intent of depriving SHI of its ability to satisfy its margin calls to [the plaintiff]." Id.

We agree with the trial court that Alexander's purpose in directing the October 2008 transfers was irrelevant to the decisive issue in the 2013 action, which was whether he drained SHI's assets with the specific intent of leaving the corporation unable to pay its debts. Although the

[17]"A quantitative analyst or 'quant' is a specialist who applies mathematics and statistical methods to financial and risk management problems." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 2021 WL 4482154, *30 n.21.

[18]In discussing equitable considerations regarding whether to pierce the corporate veil, the court similarly found that, "[f]ar from draining all of SHI's funds, [Alexander] left available in SHI's accounts at [the plaintiff] at least $511 million and paid them on request. But for [the plaintiff's] error in calculation, [Alexander] could credibly have believed that $250 million to $280 million remained in SHI's accounts at [the plaintiff in October 2008] even after paying" half a billion dollars in margin calls. *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 2021 WL 4482154, *32.

court in its memorandum of decision expressly stated that it "does not find fraud or deceit or illicit conduct" with respect to those transfers, that determination was not essential to the court's judgment. See *DaCruz* v. *State Farm Fire & Casualty Co.*, 268 Conn. 675, 686, 846 A.2d 849 (2004) ("[i]ssue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment" (internal quotation marks omitted)). The court's memorandum of decision in the 2013 action plainly indicates that its conclusion that Alexander did not act with the requisite intent when he drained SHI's assets was predicated on the court's determinations that, at the time of the October 2008 transfers, (1) neither Alexander nor the plaintiff knew the extent of the losses that were eventually calculated, (2) Alexander did not drain all of SHI's assets but, rather, "reserved over half a billion dollars to cover SHI's unspecified debts," and (3) Alexander had "no reason to believe [that this] remainder . . . would be inadequate to cover any debt to [the plaintiff]." *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 2021 WL 4482154, *31. Because the judgment denying the plaintiff's declaratory action to pierce the corporate veil in the 2013 action could have been validly rendered without resolving the issue of whether the October 2008 transfers were proper, that issue was not necessary to the judgment.[19] See *Torrington Tax Collector, LLC* v. *Riley*, supra, 354 Conn. 80. For that reason,

---

[19]The present case thus resembles illustration 13 to § 27 of the Restatement (Second), which states: "A brings an action against B to recover interest on a promissory note payable to A, the principal not yet being due. B alleges that he was induced by the fraud of A to execute the note, and further alleges that A gave him a release under seal of the obligation to pay interest. The court, sitting without a jury, finds that A had given such a release but that B was not induced by A's fraud to execute the note, and gives verdict for B on which judgment is entered. After the note matures A brings an action against B for the principal of the note. B is not precluded from defending this action on the ground that B was induced by A's fraud to execute the note." 1 Restatement (Second), supra, § 27, illustration (13), p. 258.

the trial court in the present case improperly concluded that collateral estoppel applies to that issue.

## C
### Ownership of Confirmit Shares

In its memorandum of decision, the court also concluded that collateral estoppel precluded the plaintiff from relitigating whether Alexander "was the owner of the Confirmit shares in October 2008." For two reasons, we disagree.

First, the issue of precisely who owned the Confirmit shares in October 2008 was not necessary to the judgment in the 2013 action.[20] The plaintiff's action to pierce the corporate veil required the court in the 2013 action to determine whether Alexander exercised dominion and control over SHI, whether he commingled its assets with his own, and whether he instigated the October 2008 transfers with the specific intent of rendering SHI unable to pay its margin calls to the plaintiff. See *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, supra, 346 Conn. 584. The court found that the plaintiff had not established that specific intent. Accordingly, the question of whether Alexander was the owner of the Confirmit shares that were transferred in October 2008 was not necessary to the court's judgment declining to pierce the corporate veil.

Second, Alexander's ownership of the Confirmit shares in October 2008 is neither disputed by the plaintiff nor relevant to the present action. In its complaint in this case, the plaintiff alleged that Alexander "maintained sole ownership of . . . Confirmit until approximately 2015

[20]In neither their appellate brief nor their oral argument before this court have the defendants offered any analysis as to why a determination that Alexander was the owner of the Confirmit shares in October 2008 was necessary to the judgment in the 2013 action. See, e.g., *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 378–79, 727 A.2d 1245 (1999) ("[a]s the moving party seeking summary judgment, it [is] incumbent upon the defendants to show that the judgment against the plaintiffs in the [prior] action could not have been rendered without deciding the issues upon which the [present] action was predicated").

. . . .''[21] The plaintiff further averred that, on December 21, 2016, the Oslo Enforcement Court "held that SHI was the true owner of the Confirmit shares at the time the execution lien was established" in 2016, and that the Supreme Court of Norway affirmed that decision in 2019, "thereby definitively establishing that SHI was the true owner of the Confirmit shares at the time the execution lien was put in place." The present action, therefore, does not concern ownership of the Confirmit shares in 2008 but, rather, their ownership in 2016 when the execution lien was established. As a result, the requisite identity of issues necessary to advance a collateral estoppel defense; see *Solon* v. *Slater*, supra, 345 Conn. 811; is lacking with respect to that issue. As our Supreme Court noted in the earlier appeal in this case, "[t]he [2013 action] involved the narrow question of whether the trial court could pierce SHI's corporate veil and hold Alexander personally liable for the English judgment *on the basis of conduct occurring prior to November 1, 2008. . . .* The present case involves whether the defendants were involved in a conspiracy *between 2016 and 2020* to halt or delay the sale of a Norwegian software company in order to prevent the plaintiff from partially satisfying the English judgment." (Citation omitted; emphasis added.) *Deutsche Bank AG* v. *Vik*, supra, 349 Conn. 136. For those reasons, we conclude that the court improperly concluded that collateral estoppel applied to the issue of whether Alexander was the owner of the Confirmit shares in October 2008.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

---

[21]In its complaint in the 2013 action, the plaintiff similarly alleged that Alexander "retained legal and/or beneficial ownership and control" of the funds transferred from SHI in October 2008, including the Confirmit shares.